Michael Kind, Esq. (NV Bar No. 13903)
**KIND LAW**
8860 S. Maryland Parkway, Suite 106
Las Vegas, Nevada
Telephone: (702) 337-2322
Email: mk@kindlaw.com
[Additional Counsel Identified Below]

*Counsel for Plaintiff and the Proposed Class*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| ROBERT CEVASCO, on behalf of the Allegiant 401(k) Retirement Plan, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ALLEGIANT TRAVEL COMPANY<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT** |

On behalf of The Allegiant 401(k) Retirement Plan ("Plan"), himself, and all others similarly situated, the Robert Cevasco ("Plaintiff"), files this Class Action Complaint against Allegiant Travel Company ("Allegiant" or "Defendant") for breaching its fiduciary duties of prudence in violation of the Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461 ("ERISA").

**BRIEF OVERVIEW**

1.      This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§  1104, 1109, and 1132, against Defendant for breaches of fiduciary duties.

2.      Defined contribution retirement plans, like the Plan, confer tax benefits on participating employees to incentivize saving for retirement. According to the Investment Company Institute, Americans held $7.9 trillion in all employer-based defined contribution retirement plans as of March 31, 2020, of which $5.6 trillion was held in 401(k) plans. *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $28.7 Trillion in First Quarter 2020* (June 17, 2020).

3.      In a defined contribution plan, "'participants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523 (2015).

4.      Because all risks related to high fees and poorly performing investments are borne by the participants, the employer has little incentive to keep costs low or to closely monitor the Plan to ensure every investment remains prudent.

5.      The Plan is a legal entity that can sue and be sued. *See* ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the case law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

6.      To safeguard Plan participants and beneficiaries, ERISA imposes strict

fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. *See* 29 U.S.C. § 1104(a)(1)(B).

7. Because retirement savings in defined contribution plans grow and compound over the course of the employee participants' careers excessive fees can dramatically reduce the amount of benefits available when the participant is ready to retire. Over time, even small differences in fees can compound and result in a vast difference in the amount of savings available at retirement. As the Supreme Court has explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1825 (2015).

8. The impact of excessive fees on employees' and retirees' retirement assets is dramatic. The U.S. Department of Labor ("DOL") has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, p. 2 (September 2019).

9. The Plaintiff is a Plan participant.  As of December 31, 2021, the Plan had $371,281,305 in assets and 3,720 total participants with account balances as of the end of the plan year.  Instead of leveraging the Plan's tremendous bargaining power to

benefit participants and beneficiaries, Defendant caused the Plan to pay unreasonable and excessive fees for recordkeeping and other administrative services.

10.     Plaintiff has standing to bring this action on behalf of the Plan because Plaintiff participated in the Plan and was injured by Defendant's unlawful conduct. Plaintiff is entitled to receive benefits in the amount of the difference between the value of his account currently, or as of the time his account was distributed (no such distribution has occurred), and what his accounts are or would have been worth, but for Defendant's breaches of fiduciary duty as described herein.

11.     For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes based on several factors.

12.     For example, Defendant did not adhere to fiduciary best practices to control Plan fees and expenses. To the extent that Defendant made any prudent attempt to control the Plan's expenses and to ensure the expenses were not excessive, Defendant employed flawed and ineffective processes, which failed to ensure that: (a) the fees and expenses charged to Plan participants were reasonable, and (b) that the compensation third-party service providers received from the plan for services provided were reasonable.

13.     Defendant's mismanagement of the Plan constitutes a breach of the fiduciary duty of prudence in violation of 29 U.S.C. § 1104. Defendant's actions (and omissions) were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

## JURISDICTION AND VENUE

14.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

15.     This judicial District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the Plan is administered, and where at least one of the alleged breaches took place.  Additionally, venue is proper in this District because Defendant is headquartered in Las Vegas, Nevada.

## THE PLAN

16.     The Plan is a qualified retirement plan commonly referred to as a 401(k) plan.

17.     The Plan is established and maintained under written documents in accordance with 29 U.S.C. §1102(a)(1).

18.     More specifically, the Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

19.     Eligible current and former employees of Allegiant are eligible to participate in the Plan. During his employment, Plaintiff participated in the Plan paying the excessive recordkeeping and administrative costs associated with the Plan and investing in the imprudent options offered by the Plan, which are the subject of this lawsuit. The Plan provides the primary source of retirement income for many former Allegiant employees.

## THE PARTIES

### *Plaintiff & Standing*

20.     Named Plaintiff is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

21.     In terms of standing, §1132(a)(2) allows recovery for a "plan" and does not provide a remedy for individual injuries distinct from plan injuries. Here, the Plan suffered millions of dollars in losses caused by Defendant's fiduciary breaches.

22.     The Plan continues suffering economic losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiff and the Plan. The Plan is the victim of any fiduciary breach and the recipient of any recovery. *Id.* at 254.

23.     Section 1132(a)(2) authorizes any participant to sue derivatively as a representative of the plan to seek relief on behalf of the plan. 29 U.S.C. §1132(a)(2). As explained in detail below, the Plan suffered millions of dollars in losses caused by Defendant's fiduciary breaches and it remains exposed to harm and continued losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiff.

24.     To the extent the Plaintiff must also show an individual injury even though §1132(a)(2) does not provide redress for individual injuries, Plaintiff has standing to bring this action on behalf of the Plan because he participated in the Plan and was injured and continues to be injured by Defendant's unlawful conduct.

25.     To establish standing, Plaintiff need only show a constitutionally adequate injury flowing from those decisions or failures. Plaintiff alleges such an injury for each

claim.

26.     More specifically, Plaintiff has standing because the challenged conduct, including Defendant's actions resulting in Plaintiff and the class members paying excessive recordkeeping and administrative fees, and affected all Plan participants in the same way.

27.     For example, the Named Plaintiff's individual account in the Plan suffered losses because, in fact, each participant's account was assessed an excessive amount for recordkeeping and administrative fees, which would not have been incurred had Defendant discharged its fiduciary duties to the Plan and reduced those fees to a reasonable level.

28.     All class members have standing for the same reason.  Each class member's individual account in the Plan suffered losses because, in fact, each participant's account was assessed an excessive amount for recordkeeping and administrative fees, which would not have been incurred had Defendant discharged its fiduciary duties to the Plan and reduced those fees to a reasonable level.

29.     As a result of Defendant's actions, the Plaintiff and class members are entitled to restitution in the amount of the difference between the value of their account currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendant's breaches of fiduciary duty as described herein.

### ***The Defendant***

30.     Defendant Allegiant is the Plan Sponsor and a fiduciary of the Plan within

the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because: (a ) it is a named fiduciary under the Plan, (b) during the Class Period, it exercised discretionary authority and control over Plan management and/or authority or control over management or disposition of Plan assets.

31.    Defendant is also a fiduciary to the Plan because it is the Plan Administrator and exercised authority or discretionary control respecting the management of the Plan or exercised authority or control respecting the management or disposition of Plan assets and has discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. §1002(21)(A)(i) and (iii).

32.    At all times during the Class Period, Allegiant has acted through its Board of Directors to appoint fiduciaries of the Plan, including the Administrative Committee ("Committee"). Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

33.    Defendant through its Board of Directors, had a fiduciary duty to monitor and supervise the Plan's fiduciaries, including the Committee and its members during the Class Period, but, as set forth in detail below, the Committee failed to carry out these fiduciary duties prudently.

34.    Defendant's fiduciary duties to the Plan include, *inter alia*, selecting and regularly reviewing the investment options that are available to Plan participants in order to ensure that such investment options are at times prudent, and selecting and regularly reviewing the service providers to the Plan, including the Plan's recordkeeper and advisors and consultants to the Plan in order to ensure that the fees charged by such

service providers are reasonable.

35. For the foregoing reasons, at all times during the Class Period, Defendant was a fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercised discretionary authority over management or disposition of Plan assets and because it exercised discretionary authority to appoint and/or monitor the other fiduciaries, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

### *Additional Information on the Plan*

36. Defendant established the Plan as a defined contribution plan in 2000. The Plan was amended in January 2021 and March 2022.

37. The Plan covers substantially all non-union employees of Defendant and its subsidiaries.

38. Fidelity Management Trust Company (the "Trustee") serves as the Trustee of the Plan and over The Allegiant 401(k) Retirement Plan Master Trust (the "Master Trust").

39. Fidelity Investments Institutional ("Recordkeeper" or "Fidelity") serves as the recordkeeper for the Plan.

40. The Plan is subject to the provisions of ERISA.

41. With respect to contributions, each year participants may contribute from 1% to 75% of their pre-tax annual compensation, as defined by the Plan, subject to certain Internal Revenue Code ("IRC") limitations.

42. Notably, Management fees and operating expenses, including in some

instances, recordkeeping fees, are charged to the Plan via investments in mutual funds within the Master Trust and such fees are deducted by the Recordkeeper directly from Plan participant individual accounts and such deductions are not separately reflected in any disclosures to Plan participants. Consequently, it is very difficult, if not impossible, for Plan participants to know how much the Recordkeeper deducts from their individual accounts for such fees.

## **CLASS ACTION ALLEGATIONS**

43.     Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the following proposed class ("Class"):[1]

> All persons who were participants or beneficiaries of the
> Plan, at any time between October 17, 2016, and the present
> (the "Class Period").

44.     Members of the Class are so numerous that joinder is impractical. According to the most recent Form 5500 filed with the DOL, there were 3,720 participants in the Plan with account balances as of December 31, 2021.

45.     Plaintiff's claims are typical of the claims of the members of the Class. Like other Class members, Plaintiff participated in the Plan and suffered injuries because of Defendant's ERISA fiduciary breaches. Defendant treated Plaintiff consistently with other Class members and managed the Plan as a single entity. Plaintiff's claims and the claims of all Class members arise out of the same conduct,

---

[1] Plaintiff reserves the right to propose other or additional classes or subclasses in his motion for class certification or subsequent pleadings in this action.

policies, and practices of Defendant as alleged herein, and all members of the Class have been similarly affected by Defendant's wrongful conduct.

46.   There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

> A.   Whether Defendant is fiduciary of the Plan;
>
> B.   Whether Defendant breached its fiduciary duty of prudence by engaging in the conduct described herein;
>
> C.   Whether Defendant failed to adequately monitor other fiduciaries to ensure the Plan was being managed in compliance with ERISA;
>
> D.   The proper form of equitable and injunctive relief; and
>
> E.   The proper measure of relief.

47.   Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiff has no interests antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

48.   This action may be properly certified under Fed. R. Civ. P. 23(b)(1). Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendant. Class action status is also warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect

to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

49.     In the alternative, certification under Fed. R. Civ. P. 23(b)(2) is warranted because the Defendant has acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

**DEFENDANT'S FIDUCIARY STATUS AND
OVERVIEW OF FIDUCIARY DUTIES**

50.     ERISA requires every covered retirement plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

51.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent: "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercise any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

52.     As described above, Defendant was (and still is) a fiduciary of the Plan because:

A.     it so named; and/or

B.     exercised authority or control respecting management or disposition of the Plan's assets; and/or

C.     exercised discretionary authority or discretionary control respecting management of the Plan; and/or

D.     had discretionary authority or discretionary responsibility in the administration of the Plan.

53.     As a fiduciary, Defendant were and are required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1)(A), to manage and administer the Plan solely in the interest of the Plan's participants and beneficiaries, defray reasonable expenses of administering the Plan, and to do so with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims as the Plan.  These twin duties are referred to as the duties of loyalty and prudence, and they are "the highest known to the law." *Sweda*, 923 F.3d at 333.

54.     As set forth in detail below, Defendant breached its fiduciary duties of prudence to the Plan, Plan participants, and Plan beneficiaries, and Defendant is, therefore, liable for its breach under 29 U.S.C. §§ 1104, 1109, and 1132.

## SPECIFIC ALLEGATIONS

### *Improper Management of the Plan Cost the Plan's*
### *Participants Millions in Savings*

55.     "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA") § 7; *see also* 29 U.S.C. § 1104(a)(1)(A) (requiring ERISA fiduciaries to "defray reasonable expenses of administering the plan.").

56.     "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197–98 (9th Cir. 2016) (quoting Restatement (Third) of Trust § 90, cmt. b). *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, at 2 (Aug. 2013) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan ... Employers are held to a high standard of care and diligence and must discharge their duties solely in the interest of the plan participants and their beneficiaries.").[2]

57.     Higher fees of only 0.18% to 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees for materially identical funds lose not only the money spent on higher fees, but also 'lost

---

[2]  Available at: https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited October 3, 2022).

investment opportunity'; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1198.

58.     Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement. "The 401(k) is the major source people think they are going to rely on."[3] Although 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices of plan fiduciaries, whether due to poor performance, high fees, or both.

59.     Indeed, the DOL has stated that employers are held to a "high standard of care and diligence" and must both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices," among other duties. *See* "A Look at 401(k) Plan Fees," *supra*.

60.     The duty to evaluate and monitor plan expenses, investments and investment costs, includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment. *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses*, at 4 (July 2016).[4] "Any costs not paid by the employer, which may include administrative,

---

[3] Brandon, Emily, "10 Essential Sources of Retirement Income," (May 6, 2011), available at: https://money.usnews.com/money/retirement/slideshows/10-essential-sources-of-retirement-income (last visited October 3, 2022).

[4] Available at: https://www.ici.org/pdf/per22-04.pdf (last visited October 3, 2022).

investment, legal, and compliance costs, effectively are paid by plan participants." *Id.* at 5.

### ***Defendant Failed to Monitor or Control the Plan's Recordkeeping and Administrative Expenses***

61.     The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a plan by the plan's "recordkeeper." Beyond simple provision of account statements to participants, it is quite common for the recordkeeper to provide a range of services to a plan as part of a package of services. These services typically include, preparation of individual account statements, delivery of individual account statements, claims processing, participant communications, participant loan processing, Qualified Domestic Relations Order ("QDRO") processing, and preparation of ERISA required disclosures to participants and regulators.

62.     Nearly all recordkeepers in the marketplace offer the same range of services. The services are essentially the same. Many of the recordkeeping services can be provided by recordkeepers at little cost.

63.     The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. As a result of such competition, vendors vigorously compete for business by offering the best price, rather than differentiating themselves based on the quality or range of services offered.

64.     Individual plan participants cannot negotiate with recordkeepers on behalf of the Plan. That responsibility falls to the Plan's fiduciaries – in this case Defendant. ERISA explicitly requires plan fiduciaries to prudently defray plan expenses. 29 U.S.C.

1104(a)(1)(A). Accordingly, prudent fiduciaries routinely bargain for low recordkeeping fees. *See, e.g.*, *George v. Kraft Foods Global, Inc*., 641 F.3d 786 (7th Cir. 2011) (expert opined market rate for large plans is approximately $20–$27 per plan participant); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D. Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping); *Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (Doc. 562-2, Jan. 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years).

65. The cost of providing recordkeeping services primarily depends on the number of participants in a plan, rather than the range of services provided to the plan. Because recordkeeping expenses are driven by the number of participants in a plan, most plans are charged on a per-participant basis. Plans with large numbers of participants can and do take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.

66. Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both). Revenue sharing payments are derived from investments within the plan, typically mutual funds. A percentage of all the money invested by plan participants in mutual funds is removed from the plan participants' individual accounts and diverted to the recordkeeper – ostensibly, to pay for plan administrative expenses.

67.     Utilizing a revenue sharing approach is not *per se* imprudent. Plaintiff is not making a claim against Defendant merely because it used revenue sharing to pay recordkeeping fees.

68.     However, when (as here) revenue sharing is left unchecked, it can be devastating for plan participants. "At worst, revenue sharing is a way to hide fees. Nobody sees the money change hands, and very few understand what the total investment expense pays for. It is a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." *See* Justin Pritchard, "Revenue Sharing and Invisible Fees."[5]

69.     Because revenue sharing payments are asset based, they bear no relation to actual services provided and, likewise, bear no relation to a reasonable recordkeeping fee, and can provide excessive compensation by plan participants to recordkeepers.

70.     Again, it is important to emphasize that fees obtained through revenue sharing are tethered not to any actual services provided to a plan; but rather, to a percentage of assets in a plan and/or investments in mutual funds in a plan. As the assets in a plan increase, so too increases the recordkeeping fees that the recordkeeper pockets from the plan and its participants.

---

[5]  Available at: http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited October 3, 2022).

71.     One commentator likened this fee arrangement to hiring a plumber to fix a leaky gasket and paying the plumber based not on actual work provided but, rather, based on the amount of water that flows through the pipe. If asset-based fees are not monitored, the fees skyrocket as more money flows into the Plan.

72.     For example, assume a plan had two participants. The two plan participants each had individual accounts in the plan with $1,000 invested. The plan contracted with a recordkeeper who agreed that $25 per participant, per year, was a fair and reasonable fee for recordkeeping. But instead of charging each participant $25 directly each year, the plan and recordkeeper agreed that the record keeper would collect its fee by assessing a 250-basis point fee to each plan participants for all assets under management in the plan – the amount equals the agreed upon $25.00 per participant, per year. Assume, as time passes the two participants individual accounts increase in value from $1,000 to $1,000,000. If the recordkeeper's fee is not renegotiated, the recordkeeper will collect $25,000 per year, per participant, instead of the fair and reasonable $25.00 per year, per participant fee.

73.     It is well-established that plan fiduciaries have an obligation to monitor and control recordkeeping fees to ensure that such fees remain reasonable. *See, e.g.*, *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("*Tussey II*") (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan). Excessive expenses "decrease [an account's] immediate value" and "depriv[es] the participant of the prospective value of funds that would have continued to grow if not taken out in fees." *Sweda*, 923 F.3d at

328. No matter the method of payment or fee collection, the fiduciary must understand the total amount paid the recordkeeper and per-participant fees and determine whether pricing is competitive. *See Tussey II*, 746 F.3d at 336. Thus, defined contribution plan fiduciaries have an ongoing duty to ensure that the recordkeeper's fees are reasonable.

74.     Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. First, they must closely monitor the recordkeeping fees being paid by the plan. A prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and stand-alone pricing reports.

75.     Second, to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify *all* fees, including direct compensation and so-called "indirect" compensation through revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries closely monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants. Additionally, to the extent prudent fiduciaries agree that recordkeepers receive interest or float income from funds transferred into or out of a plan, fiduciaries track and control these amounts as well.

76.     Third, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by similar plans, as well as the recordkeeping rates that are available in the marketplace. This will generally include conducting a request for proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if a plan experiences an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

77.     The Plan's assets under management have exploded over the past ten years.  The Plan's assets under management was $35,231,655 in 2012. The Plan's assets under management was $371,281,312 in 2021. Because the Recordkeeper is compensated via revenue sharing, the compensation the Recordkeeper receives from the Plan has exploded too. The administrative and recordkeeping fees the Recordkeeper receives are excessive in relation to the services provided to the Plan.

78.     The direct and indirect payments that Defendant caused the Plan, participants, and beneficiaries to make for recordkeeping and administrative services during the Class Period were excessive and unreasonable. Defendant breached its duty of prudence by failing to monitor, control, negotiate, and otherwise ensure that indirect

compensation Plan participants' pay to Fidelity via revenue sharing was not excessive and unreasonable.

79.    All national recordkeepers, like Fidelity, Empower, Schwab, etc., have the capability to provide recordkeeping services at very little cost to large defined contribution plans.

80.    Fees related to additional a la carte services (e.g., participant loans, self-directed brokerage services, and other ancillary services) were also deducted directly from participant accounts, resulting in additional fees and expenses that increased overall recordkeeping and administrative fees for Plan participants in an amount more than $200 per participant annually.

81.    Fidelity was hired as the Plan's recordkeeper in 2011, and still is in that role today.

82.    There is nothing to indicate that Defendant has undertaken a proper RFP since 2011. If Defendant had undertaken an RFP to compare Fidelity's compensation with those of others in the marketplace, Defendant would have recognized that Fidelity's compensation for recordkeeping and administrative services during the Class Period has been (and remains) unreasonable and excessive.

83.    Additionally, as noted above the Plan had more than $371,281,305 in assets under management as of December 31, 2021. This is Plan participant money. Defendant agreed that anytime Plan participants deposit or withdraw money from their individual accounts the money will first pass through a Fidelity clearing account.

84.     Defendant reported for the year 2021, $44,870,640 was added to Plan participants individual accounts and at least, $27,818,392 was withdrawn from Plan participants individual accounts. The total added and withdrawn in 2021 was $72,689,032.

85.     Fidelity earned income on $72,689,032 of Plan participant money while it was in Fidelity's clearing account. This is another form of indirect compensation that Fidelity receives as the recordkeeper for the Plan. However, Defendant has not tracked, monitored, or negotiated the amount of compensation Fidelity receives from income it earns on Plan participant money in Fidelity's clearing account. Moreover, Defendant does not even know how much fidelity pockets from this source of indirect compensation. Defendant breached its fiduciary duty of prudence by allowing Fidelity to receive excessive and unreasonable compensation from Plan participants and without even knowing the amount of compensation Fidelity collects from interest on participant money.

86.     Fidelity also receives "direct compensation" from Plan participants. From 2015 to 2020 the direct compensation that Fidelity received from Plan participants, per participant, as disclosed on the Plan's 5500 disclosures filed with the DOL were as follows:

| Year | Direct Recordkeeping Compensation Per-Participant (annually) |
|------|-------------------------------------------------------------|
| 2015 | $31.25 |
| 2016 | $33.39 |

| Year | Direct Recordkeeping Compensation Per-Participant (annually) |
|---|---|
| **2017** | **$50.01** |
| **2018** | **$57.35** |
| **2019** | **$68.93** |
| **2020** | **$75.62** |
| **2021** | **$72.24** |

87.    Plans of similar size pay annually no more than $25 - $30 per participant annually in total for recordkeeping fees. Thus, the direct compensation that Fidelity received was – on a stand-alone basis – excessive for recordkeeping. Here, the direct compensation alone was more than double what a reasonable fee should have been.

88.    In fact, Defendant's own recordkeeper, Fidelity, has provided evidence supporting Plaintiff's position on this discrete issue. Fidelity's own retirement plan was recently sued. In that case, the "parties [] stipulated that if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14-$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper." *Moitoso et al. v. FMR, et al.*, 451 F.Supp.3d 189, 214 (D. Mass. 2020).

89.    But there's more. In the *Moitoso*, case Fidelity went on to stipulate as follows:

The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year; and **the value of the recordkeeping services that Fidelity has provided to the Plan since January 1, 2017 is $14 per participant, per year**. Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity, it could have obtained recordkeeping services for these amounts during these periods. The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-record kept plan with at least $1 billion in assets during the Class Period (November 18, 2014 to the present).[6]

90.     The key takeaway from this stipulation by Fidelity, the same recordkeeper utilized in this case, is simple:  Fidelity served as Allegiant's Plan's recordkeeper during much of the same time period from the *Moitoso* case when Fidelity admitted (1) ***it did not provide recordkeeping services to its plan*** that were broader or more valuable than any of the plans where it is the recordkeeper (*i.e.*, the Plan here) and, more importantly, (2) the value of those services ranged from between ***$14 to $17* per participant annually**.

91.     Thus, Allegiant Plan fiduciaries should have negotiated for recordkeeping and administration fees for somewhere between $17 beginning in January 2017 down to $14 per Plan participant currently but failed to do so.

92.     The Plan had between 2,500 and 5,000 participants during the Class Period, making it eligible for some of the lowest fees on the market.

---

[6] *Moitoso*, No. 1:18-cv-12122-WGY, ECF 138-67, ¶ 2 (emphasis added)

93.     Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

94.     Additionally, as noted above, Fidelity did not receive only the direct compensation from the Plan, it received—it received even more compensation for recordkeeping services through revenue sharing payments and through float income.

95.     As one industry expert has noted: "If you don't establish tight control, the growth of your plan's assets over time may lead to higher than reasonable amounts getting paid to service providers. This is because most revenue sharing is asset-based. If a recordkeeper's workload is about the same this year as last, why should they get more compensation just because the market had a big year and inflated the asset base? In a large plan, this phenomenon can lead to six figure comp bloat over time. That's bad for plan participants and bad for fiduciaries." Jim Phillips, *(b)est Practices: What Do You Know About Revenue Sharing?*, PLANSPONSOR.com (June 6, 2014).

96.     The best practice is a flat price based on the number of participants in a plan, which ensures that the amount of compensation will be tied to the actual services provided and that the recordkeeping fees will not fluctuate or change based upon, *e.g.*, an increase in assets in the plan.

97.    The total amount of recordkeeping fees (both through direct and indirect payments) currently is at least $200 per participant annually, when a reasonable fee ought to be no more than $25 per participant annually.

98.    The recordkeeping fees paid to Fidelity are far greater than recognized reasonable rates for a plan with nearly $400,000,000 in assets. Given the growth and size of the Plan's assets during the Class Period, in addition to the general trend towards lower recordkeeping expenses in the marketplace, the Plan could have obtained recordkeeping services that were comparable to the typical services that would have been provided to the Plan by Fidelity. Fidelity performs tasks for the Plan such as validating payroll data, tracking employee eligibility and contributions, verifying participant status, recordkeeping, and information management (computing, tabulating, data processing, etc.).

99.    Fidelity's compensation was excessive in relation to the services it provided because, in fact, the services that Fidelity provided were nothing out of the ordinary, and a prudent fiduciary would have observed the excessive compensation being paid to Fidelity and taken corrective action.

100.    Defendant's failure to monitor and control Fidelity's compensation cost the Plan millions of dollars during the Class Period and constituted a breach of the duty of prudence.

101.    Looking at recordkeeping costs for other plans of a similar size shows that the Plan was paying significantly higher recordkeeping fees than its peers – an indication

the Plan's fiduciaries failed to appreciate the prevailing circumstances surrounding recordkeeping and administration fees.

102.     Here is yet another example, Fidelity acts as the recordkeeper for Molson Coors Beverage Company USA, LLC ("Molson Plan"). The Molson Plan filed a Form 5500 disclosure for the year ending 2020 that shows it had 2,948 plan participants, $455,926,00 of assets under management in the plan, Fidelity is the plan's recordkeeper, and the plan's participants paid $9.42 per participant annually for recordkeeping. The services Fidelity provides to the Molson Plan are virtually identical to those provided to the Plan here. These services include validating payroll data, tracking employee eligibility and contributions, verifying participant status, recordkeeping, and information management.

103.     However, Defendant permitted Fidelity to charge the Plan in this case $75.62 in direct fees only per participant annually, or nearly eight times what Fidelity charged the Molson Plan, for basically the same services, making the fees charged to this Plan, in this case, excessive.

104.     Considering that the recordkeeping services provided by Fidelity in this case are similar to those provided by all national recordkeepers, like Schwab, Empower, and even Fidelity itself, Defendant's flawed decision-making process caused the Plan and its participants to pay more than $75 in direct compensation to Fidelity is imprudent.

105.     As such, Defendant either engaged in little to no examination, comparison, or benchmarking of the recordkeeping/administrative fees of the Plan to those of other similarly sized 401(k) plans, or it was complicit in paying grossly excessive fees. Had

Defendant conducted a meaningful examination, comparison, or benchmarking, as any prudent fiduciary would, Defendant would have known that the Plan was compensating Fidelity at an inappropriate level for its size. Plan participants bear this excessive fee burden and, accordingly, achieve considerably lower retirement savings, since the extra fees, particularly when compounded, have a damaging impact upon the returns attained by participant retirement savings.

106.    By failing to recognize that the Plan and its participants were being charged much higher fees than they should have been and/or failing to take effective remedial actions, Defendant breached its fiduciary duties to the Plan.

107.    In sum, given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, Defendant could have obtained for the Plan recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.  Defendant failed to do so and, as a result, violated its fiduciary duties under ERISA.

### *Defendant Breached Its Fiduciary Duties by Selecting More Expensive Share Classes Instead of Low-Cost Institutional Shares of the Same Funds*

108.    The Supreme Court reaffirmed the ongoing fiduciary duty to monitor a plan's investment options in *Tibble*, 575 U.S. 523. In *Tibble*, the Court held that "an ERISA fiduciary's duty is derived from the common law of trusts," and that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Id.* at 1828. In so holding, the Supreme Court referenced with approval

the Uniform Prudent Investor Act ("UPIA"), treatises, and seminal decisions confirming the duty.

109.    The UPIA, which enshrines trust law, recognizes that "the duty of prudent investing applies both to investing and managing trust assets...." *Tibble*, 575 U.S. 523 (quoting Nat'l Conference of Comm'rs on Uniform State Laws, Uniform Prudent Investor Act § 2(c) (1994)). The official comment explains that "'[m]anaging embraces monitoring, that is, the trustee's continuing responsibility for oversight of the suitability of investments already made as well as the trustee's decisions respecting new investments." *Id*. § 2 comment.

110.    Under trust law, one of the responsibilities of the Plan's fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs." Restatement (Third) of Trusts Ch. 17, intro. note (2007); *see also* Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function.").

111.    Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings. *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718–19 (2d Cir. 2013).

112.    A document titled, Fidelity Pricing Options for Retirement Plans dated

September 30, 2022 is attached as Exhibit 1. The document shows Defendant failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's mutual funds, which are identical to the mutual funds in the Plan in every way except for their lower cost. That is, by causing Plan participants to pay more for identical investments, Defendant failed in its statutory ERISA duty to prudently defray costs of the Plan. The chart below demonstrates how much more expensive the share classes in the Plan are than available identical fund lower cost share classes:

| Fund in Plan | Net Expense Ratio | Lower Cost Share Class of <u>Same Fund</u> | Net Expense Ratio |
|---|---|---|---|
| FSNJX<br>Fidelity Freedom 2005 Fund Class K | **0.42%** | FITKX<br>Fidelity Freedom 2005 Fund Class K6 | **0.37%** |
| FSNKX<br>Fidelity Freedom 2010 Fund Class K | **0.44%** | FOTKX<br>Fidelity Freedom 2010 Fund Class K6 | **0.38%** |
| FSNLX<br>Fidelity Freedom 2015 Fund Class K | **0.47%** | FPTKX<br>Fidelity Freedom 2015 Fund Class K6 | **0.40%** |
| FSNOX<br>Fidelity Freedom 2020 Fund Class K | **0.51%** | FATKX<br>Fidelity Freedom 2020 Fund Class K6 | **0.42%** |
| FSNPX<br>Fidelity Freedom 2025 Fund Class K | **0.54%** | FDTKX<br>Fidelity Freedom 2025 Fund Class K6 | **0.44%** |
| FSNQX<br>Fidelity Freedom 2030 Fund Class K | **0.58%** | FGTKX<br>Fidelity Freedom 2030 Fund Class K6 | **0.46%** |
| FSNUX<br>Fidelity Freedom 2035 Fund Class K | **0.61%** | FWTKX<br>Fidelity Freedom 2035 Fund Class K6 | **0.48%** |

| Fund in Plan | Net Expense Ratio | Lower Cost Share Class of <u>Same</u> <u>Fund</u> | Net Expense Ratio |
|---|---|---|---|
| FSNVX<br>Fidelity Freedom 2040 Fund Class K | **0.65%** | FHTKX<br>Fidelity Freedom 2040 Fund Class K6 | **0.50%** |
| FSNZX<br>Fidelity Freedom 2045 Fund Class K | **0.65%** | FJTKX<br>Fidelity Freedom 2045 Fund Class K6 | **0.50%** |
| FSNBX<br>Fidelity Freedom 2050 Fund Class K | **0.65%** | FZTKX<br>Fidelity Freedom 2050 Fund Class K6 | **0.50%** |
| FSNDX<br>Fidelity Freedom 2055 Fund Class K | **0.65%** | FCTKX<br>Fidelity Freedom 2055 Fund Class K6 | **0.50%** |
| FSNFX<br>Fidelity Freedom 2060 Fund Class K | **0.65%** | FFLEX<br>Fidelity Freedom 2060 Fund Class K6 | **0.50%** |
| FSNDX<br>Fidelity Freedom 2065 Fund Class K | **0.65%** | FFSZX<br>Fidelity Freedom 2065 Fund Class K6 | **0.08%** |

113. Throughout the Class Period, the Plan met the eligibility criteria for the Fidelity Freedom K6 share class, which has been offered by Fidelity since June 7, 2017.

114. As Exhibit 1, and the table above illustrate, throughout the Class Period Defendant should have known of the existence and availability of lower-cost share classes. Yet, Defendant selected and retained the more expensive share classes on the Plan's menu of investment options. This is akin to Fidelity publicly offering the Plan the option to purchase an investment for $1 and the Plan instead agreeing to purchase the identical investment for $2. There is over $100,000,000 of Plan participant

retirement savings invested in the funds identified above. The losses sustained by the Plan caused by Defendant's imprudence is substantial.

115.    A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the prudent share classes available and selected those for the Plan instead of the identical but higher-priced investments.

116.    There is no good-faith explanation for selecting and retaining the higher-priced and poorly performing share classes when the lower-priced and better performing share classes were available. The Plan did not receive any additional services or benefits based on its stagnate continuation of the more expensive share classes. The only difference between the two was higher price and lower returns.

### *Defendant Breached Its Fiduciary Duty of Prudence by Designating the Fidelity Freedom Active Suite Target Date Funds as the Plan's QDIA*

117.    As detailed above there is more than $100,000,000 of Plan assets invested in the wrong share classes of the Fidelity Freedom Funds. These funds are "actively" managed.

118.    They include thirteen target-date funds, that shift the funds' asset allocation over time according to their respective "glide path."  For example, as an investor gets closer to retirement, the target-date fund will increase the portfolio's holdings in bonds and decrease the portfolio's holdings in securities to decrease risk.

119.    The Fidelity Freedom Funds are also the Plan's Qualified Default Investment Alternative ("QDIA"), which means that new contributions are

automatically directed to the Fidelity Freedom Funds unless a participant directs contributions to other funds.

120.    Because of the Fidelity Freedom Funds' status as the QDIA, the funds hold such a large portion of the Plan's assets. In other words, Defendant steered Plan participants into the Fidelity Freedom Funds by designated the funds as the QDIA.

121.    Defendant breached its duty of prudence by designating the Fidelity Freedom Funds as the QDIA because the Fidelity Freedom Funds are riskier, more expensive, and are consistently outperformed by the Fidelity Freedom Index Funds, which are also included in the Plan's investment menu.

122.    The main difference between the two suites is that the index suite includes only Fidelity mutual funds that passively track market indices, whereas the active suite invests predominantly in actively managed funds that attempt to outperform the market indices. Notably, each suite's glide path demonstrates both the actively managed and passively managed suites follow essentially the same strategy, given that each suite's allocation of equities versus bonds follows the same pattern.

123.    However, because they are actively managed, the Freedom Funds charge more fees and have higher expense ratios than the Freedom Index Funds. For example, the Institutional Premium share class for each target year of the Freedom Index Funds had an expense ratio of only 0.08%, while the K share of the Freedom Funds had expense ratios ranging from 0.42% to 0.65%.

124. Despite passive management, the Freedom Index Funds outperformed the Fidelity Freedom Funds between 2017 and 2021.[7]

125. Additionally, each Freedom Index Fund bears an equal or higher rating by Morningstar – a well-respected industry analyst – than its actively managed counterpart. Apart from three small anomalies, every single one of the thirteen funds in the Freedom Index Funds received a category leading five-star rating from Morningstar. In contrast, not even one of the thirteen funds in the actively managed Fidelity Freedom Funds has a five-star rating, and only one has a four-star rating.

126. Likely because of the Fidelity Freedom Funds' poor performance, many asset managers have withdrawn their investments in these funds altogether. For example, in 2018, the funds experienced an estimated $5.4 billion in net outflows. In the four years prior to 2018, the funds saw nearly $16 billion in total withdraws. At the same time, the Fidelity Freedom Index Funds have seen significant inflows, receiving an estimated $4.9 billion in new funds in 2018 alone.

127. Unfortunately, despite other asset managers recognizing the actively managed Fidelity Freedom Funds' poor performance when compared to the passively managed Fidelity Freedom Index Funds, Defendant did not. Instead, Defendant continued to double down on its misguided and imprudent strategy of retaining the

---

[7] *See, e.g.*, March 2018 Reuters special report on the Fidelity Freedom funds (the "Reuters Report") details how many investors lost confidence in the Active suite "because of their history of underperformance, frequent strategy changes and rising risk. *See* "Special Report: Fidelity puts 6 million savers on risky path to retirement," available at https://www.reuters.com/article/us-funds-fidelity-retirement-special-rep/special-report-fidelity-puts-6-million-savers-on-risky-path-to-retirement.

actively managed Fidelity Freedom Funds and continued using them as the Plan's default option.

128. Additionally, it is also worth noting that actively managed Fidelity Freedom Funds have recently been the subject of many retirement plan class action lawsuits, further demonstrating why a prudent fiduciary would not designate such expensive and poorly performing funds as the default investment option in a plan – especially when the plan also includes the prudently priced and much better performing index funds on the investment menu. *See, e.g., Garthwait v. Eversource Energy Co*., No. 3:20-CV-00902 (JCH), 2022 WL 3019633, at \*19 (D. Conn. July 29, 2022) (denying motion for summary judgment in ERISA retirement plan case alleging breach of fiduciary duty by employer due, in part, to inclusion of Fidelity Freedom Funds); *see also Boley v. Universal Health Servs., Inc*., 337 F.R.D. 626, 631-636 (E.D. Pa. 2021) (granting motion for class certification in case asserting claims related to Fidelity Freedom Funds); *In re Omnicom ERISA Litig.*, No. 20-cv-4141 (CM), 2021 WL 392487 (S.D.N.Y. Aug. 2, 2021) (denying motion to dismiss breach of fiduciary duty claim based on retention of the Fidelity Freedom Funds over the Fidelity Freedom Index Funds); *In re: Prime Healthcare ERISA Litig.*, No. 8:20-cv-01529-JLS-JDE, 2021 WL 3076649 (C.D. Cal. July 16, 2021) (same); *In re Biogen, Inc. ERISA Litig.*, No. 20-cv-11325-DJC, 2021 WL 3116331 (D. Mass. July 22, 2021) (same); *In re Quest Diagnostics Inc. ERISA Litig.*, No. 20-07936-SDW-LDW, 2021 WL 1783274 (D.N.J. May 4, 2021) (same); *Blackmon v. Zachary Hldgs.*, No. 5:20-cv-988-DAE, 2021 WL 2190907 (W.D. Tex. Apr. 22, 2021) (same); *Jones v. Coca-Cola Consol., Inc.*, No. 3:20-

cv-00654-FDW-DSC, 2021 WL 1226551 (W.D.N.C. Mar. 31, 2021) (same); *In re MedStar ERISA Litig.*, No. RDB-20-1984, 2021 WL 391701 (D. Md. Feb. 4, 2021) (same).

129.    For these reasons, it was imprudent for Defendant to designate the actively managed Fidelity Freedom Funds as the QDIA for the Plan here.

## FIRST CLAIM FOR RELIEF
### *Breach of Fiduciary Duties of Prudence*

130.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

131.    As a fiduciary of the Plan, Defendant is/was subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the Plan's fees and assets for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

132.    Defendant breached its fiduciary duties in multiple respects as discussed throughout this Complaint. Defendant failed to monitor or control the grossly excessive compensation paid for recordkeeping services. Defendant failed to select the prudent share classes for the Plan. Defendant failed to designate the prudent Fidelity Freedom Index Funds as the QDIA for the Plan.

133.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Defendant complied with its fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

134.     Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendant is liable to restore to the Plan all losses caused by its breaches of fiduciary duties and must restore any profits resulting from such breaches. In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendant's breaches as set forth in the Prayer for Relief.

## SECOND CLAIM FOR RELIEF
### *Failure to Adequately Monitor Other Fiduciaries*

132.     Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

133.     Defendant is the Plan Sponsor, as defined by ERISA. Defendant had the authority and obligation to monitor all other fiduciaries for the Plan. Defendant's Board of Directors appointed an Administrative Committee ("Committee") to serve as a fiduciary of the Plan and at the discretion of Defendant's Board of Directors. Defendant, and its Board of Directors, were aware that the Committee had critical responsibilities as a fiduciary of the Plan.

134.     In light of this authority, the Defendant had a duty to monitor the Committee and ensure that the Committee was adequately performing its fiduciary

obligations, and to take prompt and effective action to protect the Plan in the event that the Committee was not fulfilling those duties.

135.    Defendant also had a duty to ensure that the Committee possessed the needed qualifications and experience to carry out its duties; had adequate financial resources and information; maintained adequate records of the information on which it based its decisions and analysis with respect to the Plan's investments; and reported regularly to Defendant.

136.    Defendant breached its fiduciary monitoring duties by, among other things:

        (a)    Failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions;

        (b)    failing to monitor the processes by which the Plan's expenses and investments were evaluated; and

        (c)    failing to remove the Committee as a fiduciary whose performance was inadequate in that it continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and the retirement savings of the Plan's participants.

137.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars in losses. Had Defendant complied with its fiduciary obligations, the Plan would not have suffered these losses, and participants of the Plan would have had more money available to them for their retirement.

138.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendant is liable to restore to the Plan all losses caused by its failure to adequately monitor the Plan Administrator and the Committee. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in his Prayer for Relief.

## **PRAYER FOR RELIEF**

For these reasons, Plaintiff, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully requests that the Court:

1.    Find and declare that the Defendant breached its fiduciary duties as described above;

2.    Find and adjudge that Defendant personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

3.    Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

4.    Order Defendant to provide all accountings necessary to determine the amounts Defendant must make good to the Plan under §1109(a);

5.    Remove fiduciaries who have breached their fiduciary duties and enjoin

them from future ERISA violations;

6.      Surcharge against Defendant and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

7.      Reform the Plan to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

8.      Certify the Class, appoint the Plaintiff as class representative, and appoint her counsel as Class Counsel;

9.      Award to the Plaintiff and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

10.     Order the payment of interest to the extent it is allowed by law; and

11.     Grant other equitable or remedial relief as the Court deems appropriate.

DATED: October 17, 2022                 Respectfully submitted,


By:   _/s/ Michael Kind_____
      Michael Kind, Esq.
      **KIND LAW**
      8860 S. Maryland Parkway, Suite 106
      Las Vegas, Nevada
      Telephone: (702) 337-2322
      Email: mk@kindlaw.com

      Eric Lechtzin, Esq.
      *Pro Hac Vice application forthcoming*
      **EDELSON LECHTZIN LLP**
      3 Terry Drive, Suite. 205
      Newtown, Pennsylvania 18940
      Telephone: (215) 867-2399
      Email: elechtzin@edelson-law.com

Brandon J. Hill, Esq.
Luis A. Cabassa, Esq.
*Pro Hac Vice applications forthcoming*
**WENZEL FENTON CABASSA, P.A.**
1110 N. Florida Avenue, Suite 300
Tampa, Florida 33602
Telephone: (813) 224-0431
Email: bhill@wfclaw.com
Email: lcabassa@wfclaw.com

Michael C. McKay, Esq.
*Pro Hac Vice application forthcoming*
**MCKAY LAW, LLC**
5635 North Scottsdale Road, Suite 170
Scottsdale, Arizona 85250
Telephone: (480) 681-7000
Email: mckay@mckay.law

*Attorneys for Plaintiff and the proposed Class*

1
2
3
4
5
6
7
8  EXHIBIT 1
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

# Fidelity Pricing Options for Retirement Plans

As of September 30, 2022

Not FDIC Insured • May Lose Value • No Bank Guarantee

For institutional use only.



# Fidelity Pricing Options for Retirement Plans

| Strategy | | Retail | | | Class K | | | K6 | | | CIT Class 1 | CIT Class 2 | CIT Class 3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Expense Ratio (%) | | | Expense Ratio (%) | | | Expense Ratio (%) | | | Management | Management | Management |
| EQUITY | Ticker | Gross | Net | Ticker | Gross | Net | Ticker | Gross | Net | Fee (%) | Fee (%) | Fee (%) |
| Blue Chip Growth | FBGRX | 0.76 | 0.76 | FBGKX | 0.68 | 0.68 | FBCGX | 0.45 | 0.45 | 0.43 | 0.35 | 0.30 |
| Capital Appreciation | FDCAX | 0.84 | 0.84 | FCAKX | 0.76 | 0.76 | | | | | | |
| Contrafund® | FCNTX | 0.81 | 0.81 | FCNKX | 0.74 | 0.74 | FLCNX | 0.45 | 0.45 | 0.43 | 0.38 | 0.35 |
| Disciplined Equity | FDEQX | 0.79 | 0.79 | FDEKX | 0.70 | 0.70 | | | | | | |
| Diversified International | FDIVX | 1.01 | 1.01 | FDIKX | 0.91 | 0.91 | FKIDX | 0.60 | 0.60 | 0.58 | 0.53 | 0.48 |
| Dividend Growth | FDGFX | 0.48 | 0.48 | FDGKX | 0.38 | 0.38 | | | | | | |
| Emerging Markets | FEMKX | 0.88 | 0.88 | FKEMX | 0.77 | 0.77 | | | | | | |
| Equity Dividend Income | FEQTX | 0.58 | 0.58 | FETKX | 0.49 | 0.49 | | | | | | |
| Equity-Income | FEQIX | 0.60 | 0.60 | FEIKX | 0.50 | 0.50 | FEKFX | 0.34 | 0.34 | 0.32 | 0.29 | 0.26 |
| Fidelity | FFIDX | 0.45 | 0.45 | FFDKX | 0.38 | 0.38 | | | | | | |
| Growth & Income | FGRIX | 0.57 | 0.57 | FGIKX | 0.49 | 0.49 | | | | | | |
| Growth Company | FDGRX | 0.79 | 0.79 | FGCKX | 0.73 | 0.73 | FGKFX | 0.45 | 0.45 | 0.43 | 0.38 | 0.35 |
| Growth Discovery | FDSVX | 0.77 | 0.77 | FGDKX | 0.68 | 0.68 | | | | | | |
| Growth Strategies | FDEGX | 0.63 | 0.63 | FAGKX | 0.52 | 0.52 | FSKGX | 0.45 | 0.45 | | | |
| Int'l Capital Appreciation | FIVFX | 1.00 | 1.00 | | | | FAPCX | 0.65 | 0.65 | | | |
| | | | | | | | | | | | | |
| MINIMUMS | | N/A | | | N/A | | | N/A | | $50 million | $500 million* | $1 billion |

\* Class 2 minimum for Blue Chip Growth was lowered to $300 million. All other Class 2 minimums are $500 million.
All other Fidelity Funds have a Retail share class only. • CITs are only available to institutional clients in certain qualified employer plans. Eligibility for qualified plans is determined by the definition of "Qualified Investor" in the underlying Group Trust. • FMTC minimums: $50 million for the CIT Class 1, $500 million for the CIT Class 2, and $1 billion for the CIT Class 3. Eligibility for each class of a pool will be determined based on the plan's(s') investment in the pool(s) and various other considerations.

For institutional use only.

Fidelity
INVESTMENTS

# Fidelity Pricing Options for Retirement Plans (continued)

| Strategy | | Retail | | | Class K | | | K6 | | CIT Class 1 | CIT Class 2 | CIT Class 3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Expense Ratio (%) | | | Expense Ratio (%) | | | Expense Ratio (%) | | Management | Management | Management |
| EQUITY | Ticker | Gross | Net | Ticker | Gross | Net | Ticker | Gross | Net | Fee (%) | Fee (%) | Fee (%) |
| International Discovery | FIGRX | 0.99 | 0.99 | FIDKX | 0.90 | 0.90 | FDKFX | 0.60 | 0.60 | 0.58 | 0.53 | 0.48 |
| Large Cap Stock | FLCSX | 0.54 | 0.54 | | | | FCLKX | 0.45 | 0.45 | | | |
| Leveraged Co. Stock | FLVCX | 0.74 | 0.74 | FLCKX | 0.65 | 0.65 | | | | | | |
| Low-Priced Stock | FLPSX | 0.82 | 0.82 | FLPKX | 0.74 | 0.74 | FLKSX | 0.50 | 0.50 | 0.48 | 0.45 | 0.42 |
| Magellan® | FMAGX | 0.68 | 0.68 | FMGKX | 0.62 | 0.62 | FMKFX | 0.45 | 0.45 | 0.43 | 0.38 | 0.35 |
| Mid-Cap Stock | FMCSX | 0.85 | 0.85 | FKMCX | 0.76 | 0.76 | FNKFX | 0.52 | 0.52 | 0.43 | 0.40 | 0.37 |
| Mid Cap Value | FSMVX | 0.57 | 0.57 | | | | FCMVX | 0.45 | 0.45 | | | |
| OTC | FOCPX | 0.81 | 0.81 | FOCKX | 0.73 | 0.73 | FOKFX | 0.50 | 0.50 | 0.48 | 0.43 | 0.40 |
| Overseas | FOSFX | 0.99 | 0.99 | FOSKX | 0.89 | 0.89 | | | | | | |
| Small Cap Growth | FCPGX | 1.02 | 1.02 | | | | FOCSX | 0.60 | 0.60 | | | |
| Small Cap Stock | FSLCX | 0.90 | 0.90 | | | | FKICX | 0.60 | 0.60 | | | |
| Stock Selector All Cap | FDSSX | 0.68 | 0.68 | FSSKX | 0.58 | 0.58 | | | | | | |
| Value | FDVLX | 0.79 | 0.79 | FVLKX | 0.71 | 0.71 | | | | | | |
| Value Discovery | FVDFX | 0.80 | 0.80 | FVDKX | 0.70 | 0.70 | FDVKX | 0.45 | 0.45 | | | |
| Value Strategies | FSLSX | 0.86 | 0.86 | FVSKX | 0.75 | 0.75 | | | | | | |
| Strategy | | Retail | | | Advisor Class Z | | | K6 Funds | | | | |
| | | Expense Ratio (%) | | | Expense Ratio (%) | | | Expense Ratio (%) | | | | |
| FIXED INCOME | Ticker | Gross | Net | Ticker | Gross | Net | Ticker | Gross | Net | | | |
| Total Bond | FTBFX | 0.45 | 0.45 | FBKWX | 0.40 | 0.36 | FTKFX | 0.30 | 0.30 | | | |
| MINIMUMS | | N/A | | | N/A | | | N/A | | $50 million | $500 million | $1 billion |

All other Fidelity Funds have a Retail share class only. • CITs are only available to institutional clients in certain qualified employer plans. Eligibility for qualified plans is determined by the definition of "Qualified Investor" in the underlying Group Trust. • FMTC minimums: $50 million for the CIT Class 1, $500 million for the CIT Class 2, and $1 billion for the CIT Class 3. Eligibility for each class of a pool will be determined based on the plan's(s') investment in the pool(s) and various other considerations. • Class Z shares are available only to eligible investors as described in the fund's prospectus.

# Fidelity Pricing Options for Retirement Plans (continued)

| Strategy | | Retail | | | Class K | | | K6 | | | CIT Class 1 | CIT Class 2 | CIT Class 3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Expense Ratio (%) | | | Expense Ratio (%) | | | Expense Ratio (%) | | Management | Management | Management |
| ASSET ALLOCATION | Ticker | Gross | Net | Ticker | Gross | Net | Ticker | Gross | Net | Fee (%) | Fee (%) | Fee (%) |
| Balanced | FBALX | 0.51 | 0.51 | FBAKX | 0.43 | 0.43 | FBKFX | 0.32 | 0.32 | | | |
| Managed Retirement 2010 | FIRQX | 0.46 | 0.46 | FRQKX | 0.36 | 0.36 | FRQHX | 0.26 | 0.26 | | | |
| Managed Retirement 2015 | FIRSX | 0.46 | 0.46 | FKRSX | 0.36 | 0.36 | FJRSX | 0.26 | 0.26 | | | |
| Managed Retirement 2020 | FIRVX | 0.47 | 0.47 | FKRVX | 0.37 | 0.37 | FHRVX | 0.27 | 0.27 | | | |
| Managed Retirement 2025 | FIXRX | 0.48 | 0.48 | FKRFX | 0.38 | 0.38 | FHRFX | 0.28 | 0.28 | | | |
| Managed Retirement 2030 | FMRAX | 0.48 | 0.48 | FMREX | 0.38 | 0.38 | FMRFX | 0.28 | 0.28 | | | |
| Managed Retirement Income | FIRMX | 0.45 | 0.45 | FRKMX | 0.35 | 0.35 | FRHMX | 0.25 | 0.25 | | | |
| Puritan® | FPURX | 0.51 | 0.51 | FPUKX | 0.43 | 0.43 | FPKFX | 0.32 | 0.32 | | | |
| MINIMUMS | | N/A | | | N/A | | | N/A | | $50 million | $500 million | $1 billion |

All other Fidelity Funds have a Retail share class only. • CITs are only available to institutional clients in certain qualified employer plans. Eligibility for qualified plans is determined by the definition of "Qualified Investor" in the underlying Group Trust. • FMTC minimums: $50 million for the CIT Class 1, $500 million for the CIT Class 2, and $1 billion for the CIT Class 3. Eligibility for each class of a pool will be determined based on the plan's(s') investment in the pool(s) and various other considerations.

For institutional use only.

Fidelity
INVESTMENTS

# Fidelity Freedom Pricing Options

| Fund | Retail | | | Class K | | | K6 | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Expense Ratio (%) | | | Expense Ratio (%) | | | Expense Ratio (%) | |
| | Ticker | Gross | Net | Ticker | Gross | Net | Ticker | Gross | Net |
| **Freedom Income** | FFFAX | 0.47 | 0.47 | FNSHX | 0.42 | 0.42 | FYTKX | 0.37 | 0.37 |
| **Freedom 2005** | FFFVX | 0.47 | 0.47 | FSNJX | 0.42 | 0.42 | FITKX | 0.37 | 0.37 |
| **Freedom 2010** | FFFCX | 0.49 | 0.49 | FSNKX | 0.44 | 0.44 | FOTKX | 0.38 | 0.38 |
| **Freedom 2015** | FFVFX | 0.54 | 0.54 | FSNLX | 0.47 | 0.47 | FPTKX | 0.40 | 0.40 |
| **Freedom 2020** | FFFDX | 0.58 | 0.58 | FSNOX | 0.51 | 0.51 | FATKX | 0.42 | 0.42 |
| **Freedom 2025** | FFTWX | 0.62 | 0.62 | FSNPX | 0.54 | 0.54 | FDTKX | 0.44 | 0.44 |
| **Freedom 2030** | FFFEX | 0.66 | 0.66 | FSNQX | 0.58 | 0.58 | FGTKX | 0.46 | 0.46 |
| **Freedom 2035** | FFTHX | 0.71 | 0.71 | FSNUX | 0.61 | 0.61 | FWTKX | 0.48 | 0.48 |
| **Freedom 2040** | FFFFX | 0.75 | 0.75 | FSNVX | 0.65 | 0.65 | FHTKX | 0.50 | 0.50 |
| **Freedom 2045** | FFFGX | 0.75 | 0.75 | FSNZX | 0.65 | 0.65 | FJTKX | 0.50 | 0.50 |
| **Freedom 2050** | FFFHX | 0.75 | 0.75 | FNSBX | 0.65 | 0.65 | FZTKX | 0.50 | 0.50 |
| **Freedom 2055** | FDEEX | 0.75 | 0.75 | FNSDX | 0.65 | 0.65 | FCTKX | 0.50 | 0.50 |
| **Freedom 2060** | FDKVX | 0.75 | 0.75 | FNSFX | 0.65 | 0.65 | FVTKX | 0.50 | 0.50 |
| **Freedom 2065** | FFSFX | 0.75 | 0.75 | FFSDX | 0.65 | 0.65 | FFSZX | 0.50 | 0.50 |



# Fidelity Freedom Blend Pricing Options

| Fund | Retail* | | | Class K | | | K6 | | | Premier Class | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Expense Ratio (%) | | | Expense Ratio (%) | | | Expense Ratio (%) | | | Expense Ratio (%) | |
| | Ticker | Gross | Net | Ticker | Gross | Net | Ticker | Gross | Net | Ticker | Gross | Net |
| **Freedom Blend Income** | FHBZX | 0.41 | 0.41 | FHHEX | 0.31 | 0.31 | FHRDX | 0.21 | 0.21 | FFBCX | 0.19 | 0.19 |
| **Freedom Blend 2005** | FHAZX | 0.41 | 0.41 | FHGEX | 0.31 | 0.31 | FHQDX | 0.21 | 0.21 | FFBEX | 0.19 | 0.19 |
| **Freedom Blend 2010** | FHAYX | 0.41 | 0.41 | FHFEX | 0.31 | 0.31 | FHPDX | 0.21 | 0.21 | FFBHX | 0.19 | 0.19 |
| **Freedom Blend 2015** | FHAWX | 0.43 | 0.43 | FHEEX | 0.33 | 0.33 | FHODX | 0.23 | 0.23 | FFBJX | 0.20 | 0.20 |
| **Freedom Blend 2020** | FHAVX | 0.44 | 0.44 | FHCEX | 0.34 | 0.34 | FHNDX | 0.24 | 0.24 | FFBLX | 0.21 | 0.21 |
| **Freedom Blend 2025** | FHAUX | 0.45 | 0.45 | FHBEX | 0.35 | 0.35 | FHLDX | 0.25 | 0.25 | FFBNX | 0.22 | 0.22 |
| **Freedom Blend 2030** | FHATX | 0.46 | 0.46 | FHAEX | 0.36 | 0.36 | FHKDX | 0.26 | 0.26 | FFBPX | 0.23 | 0.23 |
| **Freedom Blend 2035** | FHASX | 0.48 | 0.48 | FHZDX | 0.38 | 0.38 | FHJDX | 0.28 | 0.28 | FFBRX | 0.24 | 0.24 |
| **Freedom Blend 2040** | FHARX | 0.49 | 0.49 | FHYDX | 0.39 | 0.39 | FHHDX | 0.29 | 0.29 | FFBTX | 0.25 | 0.25 |
| **Freedom Blend 2045** | FHAQX | 0.49 | 0.49 | FHXDX | 0.39 | 0.39 | FHFDX | 0.29 | 0.29 | FFBUX | 0.25 | 0.25 |
| **Freedom Blend 2050** | FHAPX | 0.49 | 0.49 | FHWDX | 0.39 | 0.39 | FHEDX | 0.29 | 0.29 | FFBWX | 0.25 | 0.25 |
| **Freedom Blend 2055** | FHAOX | 0.49 | 0.49 | FHVDX | 0.39 | 0.39 | FHDDX | 0.29 | 0.29 | FFBZX | 0.25 | 0.25 |
| **Freedom Blend 2060** | FHANX | 0.49 | 0.49 | FHTDX | 0.39 | 0.39 | FHCDX | 0.29 | 0.29 | FFCBX | 0.25 | 0.25 |
| **Freedom Blend 2065** | FFBSX | 0.49 | 0.49 | FFBKX | 0.39 | 0.39 | FFBQX | 0.29 | 0.29 | FFCHX | 0.25 | 0.25 |

\* Advisor share classes of Fidelity Freedom Blend funds are also available.

**6**   For institutional use only.



# Fidelity Freedom Index Pricing Options

| Fund | Institutional Premium Class | | | Investor Class | | | Premier Class | | |
|------|------|------|------|------|------|------|------|------|------|
| | Expense Ratio (%) | | | Expense Ratio (%) | | | Expense Ratio (%) | | |
| | Ticker | Gross | Net | Ticker | Gross | Net | Ticker | Gross | Net |
| **Freedom Index Income** | FFGZX | 0.08 | 0.08 | FIKFX | 0.12 | 0.12 | FAPIX | 0.06 | 0.06 |
| **Freedom Index 2005** | FFGFX | 0.08 | 0.08 | FJIFX | 0.12 | 0.12 | FBLPX | 0.06 | 0.06 |
| **Freedom Index 2010** | FFWTX | 0.08 | 0.08 | FKIFX | 0.12 | 0.12 | FCYPX | 0.06 | 0.06 |
| **Freedom Index 2015** | FIWFX | 0.08 | 0.08 | FLIFX | 0.12 | 0.12 | FFYPX | 0.06 | 0.06 |
| **Freedom Index 2020** | FIWTX | 0.08 | 0.08 | FPIFX | 0.12 | 0.12 | FKIPX | 0.06 | 0.06 |
| **Freedom Index 2025** | FFEDX | 0.08 | 0.08 | FQIFX | 0.12 | 0.12 | FLIPX | 0.06 | 0.06 |
| **Freedom Index 2030** | FFEGX | 0.08 | 0.08 | FXIFX | 0.12 | 0.12 | FMKPX | 0.06 | 0.06 |
| **Freedom Index 2035** | FFEZX | 0.08 | 0.08 | FIHFX | 0.12 | 0.12 | FNIPX | 0.06 | 0.06 |
| **Freedom Index 2040** | FFIZX | 0.08 | 0.08 | FBIFX | 0.12 | 0.12 | FPIPX | 0.06 | 0.06 |
| **Freedom Index 2045** | FFOLX | 0.08 | 0.08 | FIOFX | 0.12 | 0.12 | FQIPX | 0.06 | 0.06 |
| **Freedom Index 2050** | FFOPX | 0.08 | 0.08 | FIPFX | 0.12 | 0.12 | FRLPX | 0.06 | 0.06 |
| **Freedom Index 2055** | FFLDX | 0.08 | 0.08 | FDEWX | 0.12 | 0.12 | FTYPX | 0.06 | 0.06 |
| **Freedom Index 2060** | FFLEX | 0.08 | 0.08 | FDKLX | 0.12 | 0.12 | FUIPX | 0.06 | 0.06 |
| **Freedom Index 2065** | FFIKX | 0.08 | 0.08 | FFIJX | 0.12 | 0.12 | FVIPX | 0.06 | 0.06 |

Recordkeeping offset incentives listed above are for plans recordkept on the Fidelity platform. For any opportunities off platform, please contact your Fidelity representative for more information. There is no initial purchase minimum or minimum balance for Institutional Premium Class for employer-sponsored retirement plans, qualified tuition programs for which Fidelity serves as investment manager, and Fidelity health savings accounts.

7   For institutional use only.



# Fidelity Advisor Pricing Options

| Fund | Class I | | | Class Z | | |
|------|---------|---|---|---------|---|---|
| | Ticker | Expense Ratio (%) | | Ticker | Expense Ratio (%) | |
| **EQUITY** | | Gross | Net | | Gross | Net |
| **FA Growth Opportunities** | FAGCX | 0.79 | 0.81 | FZAHX | 0.67 | 0.67 |
| **FA Int'l Capital Appreciation** | FCPIX | 0.97 | 0.97 | FIDZX | 0.85 | 0.85 |
| **FA New Insights** | FINSX | 0.68 | 0.68 | FZANX | 0.56 | 0.56 |
| **FA Small Cap Value\*** | FCVIX | 0.99 | 0.99 | FIKNX | 0.87 | 0.87 |
| **ASSET ALLOCATION** | | | | | | |
| **FA Balanced** | FAIOX | 0.57 | 0.57 | FZAAX | 0.45 | 0.45 |
| **FIXED INCOME** | | | | | | |
| **FA Total Bond\*†** | FEPIX | 0.50 | 0.50 | FBKWX | 0.40 | 0.36 |

\* Classes I and Z are classes of the respective Fidelity Fund.
† There is a contractual cap on the expenses borne by the fund, which indicates the maximum level of expenses (with certain exceptions) that the fund would pay. The contract expires 12/31/22 for FBKWX (0.36%).

Classes I and Z are available only to eligible investors as described in the fund's prospectus.



# Fidelity Advisor Freedom Pricing Options

| Fund | Class I | | | Class Z | | | Class Z6 | | |
|------|---------|---------|-----|---------|---------|-----|----------|---------|-----|
| | Ticker | Expense Ratio (%) | | Ticker | Expense Ratio (%) | | Ticker | Expense Ratio (%) | |
| | | Gross | Net | | Gross | Net | | Gross | Net |
| **FA Freedom Income** | FIAFX | 0.47 | 0.47 | FIJUX | 0.42 | 0.42 | FEGLX | 0.37 | 0.37 |
| **FA Freedom 2005** | FFIVX | 0.47 | 0.47 | FIJHX | 0.42 | 0.42 | FYGLX | 0.37 | 0.37 |
| **FA Freedom 2010** | FCIFX | 0.49 | 0.49 | FIJJX | 0.44 | 0.44 | FUGLX | 0.38 | 0.38 |
| **FA Freedom 2015** | FFVIX | 0.54 | 0.54 | FIJKX | 0.47 | 0.47 | FIGLX | 0.40 | 0.40 |
| **FA Freedom 2020** | FDIFX | 0.58 | 0.58 | FIJLX | 0.51 | 0.51 | FOGLX | 0.42 | 0.42 |
| **FA Freedom 2025** | FITWX | 0.62 | 0.62 | FIJMX | 0.54 | 0.54 | FPGLX | 0.44 | 0.44 |
| **FA Freedom 2030** | FEFIX | 0.66 | 0.66 | FIJNX | 0.58 | 0.58 | FDGLX | 0.46 | 0.46 |
| **FA Freedom 2035** | FITHX | 0.71 | 0.71 | FIJOX | 0.61 | 0.61 | FHGLX | 0.48 | 0.48 |
| **FA Freedom 2040** | FIFFX | 0.75 | 0.75 | FIJPX | 0.65 | 0.65 | FKGLX | 0.50 | 0.50 |
| **FA Freedom 2045** | FFFIX | 0.75 | 0.75 | FIJQX | 0.65 | 0.65 | FCGLX | 0.50 | 0.50 |
| **FA Freedom 2050** | FFFPX | 0.75 | 0.75 | FIJRX | 0.65 | 0.65 | FVGLX | 0.50 | 0.50 |
| **FA Freedom 2055** | FHFIX | 0.75 | 0.75 | FIJSX | 0.65 | 0.65 | FBGLX | 0.50 | 0.50 |
| **FA Freedom 2060** | FDKQX | 0.75 | 0.75 | FIJTX | 0.65 | 0.65 | FNGLX | 0.50 | 0.50 |
| **FA Freedom 2065** | FDFSX | 0.75 | 0.75 | FDFQX | 0.65 | 0.65 | FDFRX | 0.50 | 0.50 |

Classes I, Z, and Z6 are available only to eligible investors as described in the fund's prospectus.

For institutional use only.



# Fidelity Advisor Freedom Blend Pricing Options

| Fund | Class I | | | Class Z | | | Class Z6 | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Ticker | Expense Ratio (%) | | Ticker | Expense Ratio (%) | | Ticker | Expense Ratio (%) | |
| | | Gross | Net | | Gross | Net | | Gross | Net |
| **FA Freedom Blend Income** | FHAJX | 0.41 | 0.41 | FHAHX | 0.31 | 0.31 | FHBDX | 0.21 | 0.21 |
| **FA Freedom Blend 2005** | FHADX | 0.41 | 0.41 | FHACX | 0.31 | 0.31 | FHJHX | 0.21 | 0.21 |
| **FA Freedom Blend 2010** | FJAWX | 0.41 | 0.41 | FJAVX | 0.31 | 0.31 | FHZCX | 0.21 | 0.21 |
| **FA Freedom Blend 2015** | FJAQX | 0.43 | 0.43 | FJAPX | 0.33 | 0.33 | FHXCX | 0.23 | 0.23 |
| **FA Freedom Blend 2020** | FJAJX | 0.44 | 0.44 | FJAIX | 0.34 | 0.34 | FHWCX | 0.24 | 0.24 |
| **FA Freedom Blend 2025** | FJADX | 0.45 | 0.45 | FJABX | 0.35 | 0.35 | FHSPX | 0.25 | 0.25 |
| **FA Freedom Blend 2030** | FJEFX | 0.46 | 0.46 | FJLMX | 0.36 | 0.36 | FHRCX | 0.26 | 0.26 |
| **FA Freedom Blend 2035** | FHGDX | 0.48 | 0.48 | FHSDX | 0.38 | 0.38 | FHQCX | 0.28 | 0.28 |
| **FA Freedom Blend 2040** | FHJFX | 0.49 | 0.49 | FHHFX | 0.39 | 0.39 | FHOCX | 0.29 | 0.29 |
| **FA Freedom Blend 2045** | FHCFX | 0.49 | 0.49 | FHBFX | 0.39 | 0.39 | FHLCX | 0.29 | 0.29 |
| **FA Freedom Blend 2050** | FHWEX | 0.49 | 0.49 | FHVEX | 0.39 | 0.39 | FHJCX | 0.29 | 0.29 |
| **FA Freedom Blend 2055** | FHQEX | 0.49 | 0.49 | FHPEX | 0.39 | 0.39 | FHGCX | 0.29 | 0.29 |
| **FA Freedom Blend 2060** | FHKEX | 0.49 | 0.49 | FHJEX | 0.39 | 0.39 | FHDCX | 0.29 | 0.29 |
| **FA Freedom Blend 2065** | FAXFX | 0.49 | 0.49 | FAXGX | 0.39 | 0.39 | FAXHX | 0.29 | 0.29 |

Classes I, Z, and Z6 are classes of the respective Fidelity Freedom Blend Fund.
Classes I, Z, and Z6 are available only to eligible investors as described in the fund's prospectus.

For institutional use only.



# Target Date Commingled Pool Pricing Summaries

## ACTIVE TARGET DATE

| Freedom Commingled Pool[1] | B / C | D / E | F / G | H / I | J / K | L / M | N / O | P / Q | R / S |
|---|---|---|---|---|---|---|---|---|---|
| Asset Minimum | <$100M | $100M–$300M | $300M–$1B | $1B–$2B | $2B–$3B | $3B–$4B | $4B–$5.5B | $5.5B–$7B | $7B+ |
| Net Expense Ratio (%) | 0.40 0.50 | 0.36 0.46 | 0.35 0.45 | 0.33 0.43 | 0.31 0.41 | 0.29 0.39 | 0.28 0.38 | 0.27 0.37 | 0.25 0.35 |
| RK Offset[2] (%) | 0.00 0.10 | 0.00 0.10 | 0.00 0.10 | 0.00 0.10 | 0.00 0.10 | 0.00 0.10 | 0.00 0.10 | 0.00 0.10 | 0.00 0.10 |

## BLEND TARGET DATE

| Freedom Blend Commingled Pool[3,4] | H / G | Q / V | S / X[5] | T / Y | L / J | I / M | N / O | F / E |
|---|---|---|---|---|---|---|---|---|
| Asset Minimum | $0–$100M | $100M–$300M | $300M–$1B | $1B–$3B | $3B–$5B | $5B–$7.5B | $7.5B–$10B | $10B+ |
| Net Expense Ratio (%) | 0.27 0.37 | 0.25 0.35 | 0.23 0.33 | 0.20 0.30 | 0.18 0.28 | 0.16 0.26 | 0.15 0.25 | 0.14 0.24 |
| RK Offset[2] (%) | 0.00 0.10 | 0.00 0.10 | 0.00 0.10 | 0.00 0.10 | 0.00 0.10 | 0.00 0.10 | 0.00 0.10 | 0.00 0.10 |

## INDEX TARGET DATE

| Freedom Index Commingled Pool[3,6] | S | T | Y | R |
|---|---|---|---|---|
| Asset Minimum | $5M–$200M | $200M–$1B | $1B–$2B | $2B+ |
| Net Expense Ratio (%) | 0.08 | 0.07 | 0.06 | 0.05 |
| RK Offset[2] (%) | N/A | N/A | N/A | N/A |

[1] Fidelity Freedom Commingled Pool series available starting on 6/1/22. [2] Recordkeeping offset incentives (RK Offset) listed above are for plans record kept on the Fidelity platform. For any opportunities off platform, please contact your Fidelity representative for more information. [3] The Fidelity Freedom Blend and Fidelity Freedom Index Commingled Pools are commingled pools of the FIAM Group Trust for Employee Benefit Plans and are managed by Fidelity Institutional Asset Management Trust Company® (FIAM®). [4] Freedom Blend Commingled Pool fees shown are as of 5/1/22. As of 6/30/22 the FIAM Blend Target Date Commingled Pools were renamed Fidelity Freedom Blend Commingled Pools. [5] Share classes R and W are legacy share classes no longer open to the public or being proactively sold. Fees align with share classes S and X respectively. [6] Freedom Index Commingled Pool fees shown are as of 6/1/21. As of 6/30/22, the FIAM Index Target Date Commingled Pools were renamed Fidelity Freedom Index Commingled Pools.

**Note that certain client transactions into the Fidelity Freedom, Fidelity Freedom Blend, and Fidelity Freedom Index Commingled Pools are subject to covering their own transition costs as part of FIAM's Significant Cash Flow policy (formerly the Anti Dilution policy). Please discuss with your Fidelity representative.**

The eligibility requirement for Fidelity Freedom, Fidelity Freedom Blend, and Fidelity Freedom Index Commingled Pools is $25 million in client assets. Client assets is defined as assets invested in qualified defined contribution plans only, which are profit sharing, 401(k), and defined benefit plans that are qualified under Section 401(a) and governmental plans that are described in section 401(a)24 of the IRS Code. Pricing for your plan will be determined based on the characteristics and attributes of your plan and may be more or less than what is indicated herein. Pricing is subject to change.

*Fidelity* INVESTMENTS

# Important Information

*Information provided in this document is for informational and educational purposes only. To the extent any investment information in this material is deemed to be a recommendation, it is not meant to be impartial investment advice or advice in a fiduciary capacity and is not intended to be used as a primary basis for you or your client's investment decisions. Fidelity and its representatives may have a conflict of interest in the products or services mentioned in this material because they have a financial interest in them, and receive compensation, directly or indirectly, in connection with the management, distribution, and/or servicing of these products or services, including Fidelity funds, certain third-party funds and products, and certain investment services.*

**For institutional use only.**

Not NCUA or NCUSIF insured. May lose value. No credit union guarantee.

Stock markets, especially foreign markets, are volatile and can decline significantly in response to adverse issuer, political, regulatory, market, or economic developments. Foreign securities are subject to interest rate, currency exchange rate, economic, and political risks, all of which are magnified in emerging markets. The securities of smaller, less well-known companies can be more volatile than those of larger companies. Growth stocks can perform differently from other types of stocks and the market as a whole and can be more volatile than other types of stocks. Value stocks can perform differently than other types of stocks and can continue to be undervalued by the market for long periods of time.

In general the bond market is volatile, and fixed income securities carry interest rate risk. (As interest rates rise, bond prices usually fall, and vice versa. This effect is usually more pronounced for longer-term securities.) Fixed income securities also carry inflation, credit, and default risks for both issuers and counterparties.

The investment risk of each Target Date strategy changes over time as its asset allocation changes. These risks are subject to the asset allocation decisions of the portfolio manager. Except for the target date index portfolios, pursuant to the portfolio manager's ability to use an active asset allocation strategy, investors may be subject to a different risk profile compared to the portfolio's neutral asset allocation strategy shown in its glide path. The portfolios are subject to the volatility of the financial markets, including that of equity and fixed income investments in the U.S. and abroad, and may be subject to risks associated with investing in high-yield, small cap, commodity-linked, and foreign securities. Fixed income investments entail issuer default and credit risk, inflation risk, and interest rate risk (as interest rates rise, bond prices usually fall, and vice versa). This effect is usually more pronounced for longer-term securities. Leverage can increase market exposure, magnify investment risks, and cause losses to be realized more quickly. No target date strategy is considered a complete retirement program and there is no guarantee any single offering will provide sufficient retirement income at or through retirement. Principal invested is not guaranteed at any time, including at or after the portfolios' target dates.

The performance of an index fund and its index may vary somewhat due to factors such as fees and expenses of the fund, transaction costs, sample selection, regulatory restrictions, and timing differences associated with additions to and deletions from its index.

Please note **K6** is a standalone fund (not a share class), so it is a conversion rather than an exchange. Conversions above 1% of TNA should be coordinated through your Fidelity contact. Please ask your Fidelity contact for additional information on the 1% threshold and the available conversion dates. If a K6 balance falls below 1% of the portfolio's total net assets, you are not limited to one of the predetermined dates.

# Important Information

**About Fidelity Management Trust Company:**

Fidelity Management Trust Company (FMTC) is a Massachusetts limited purpose trust company and Fidelity Investments entity and was established to provide investment management and trustee services to corporate and public retirement plans, endowments, foundations and other institutional investors. FMTC also provides IRAs and other retirement products to retail retirement customers.

The Fidelity Blue Chip Growth Commingled Pool, Fidelity Contrafund Commingled Pool, Fidelity Diversified International Commingled Pool, Fidelity Equity-Income Commingled Pool, Fidelity Growth Company Commingled Pool, Fidelity International Discovery Commingled Pool, Fidelity Low-Priced Stock Commingled Pool, Fidelity Magellan Commingled Pool, Fidelity Mid-Cap Stock Commingled Pool, and Fidelity OTC Commingled Pool are not mutual funds. They are commingled pools of the Fidelity Group Trust for Employee Benefit Plans and are managed by FMTC. FMTC, as trustee of the Fidelity Group Trust for Employee Benefit Plans, has claimed an exemption from registration under the Commodity Exchange Act and is not subject to registration or regulation under the Act.

Third-party trademarks and service marks are the property of their respective owners. All other trademarks and service marks are the property of FMR LLC or an affiliated company.

If receiving this piece through your relationship with Fidelity Institutional® (FI), this publication may be provided by Fidelity Distributors Company LLC or Fidelity Brokerage Services LLC, Member NYSE, SIPC.

If receiving this through your relationship with Fidelity Personal & Workplace Investing (PWI), this publication is provided by Fidelity Brokerage Services LLC, Member NYSE, SIPC.

**Before investing, consider the funds' or pools' investment objectives, risks, charges, and expenses. Contact Fidelity for a fund prospectus or, if available, a summary prospectus, or the pool's offering document, containing this information. Read it carefully.**